AO 91 (Rev. 11/11)  Criminal Complaint

FILED

Jul 28 2022

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

# UNITED STATES DISTRICT COURT

for the

Northern District of California

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) |
| Angel David Rodriguez | ) |
| | ) |
| | ) |
| | ) |
| *Defendant(s)* | ) |

Case No.   3-22-mj-70982MAG

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ May 2022 _____ in the county of _____ Alameda _____ in the
_____ Northern _____ District of _____ California _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 USC 843(b) | Unlawful use of a communications facility |

This criminal complaint is based on these facts:

See attached Affidavit of DEA SA Hakeem Oduniyi

☑ Continued on the attached sheet.

Approved as to form *Alexandra Shepard*
   AUSA: _Alexandra Shepard_

Sworn to before me by telephone.

Date: _____ 07/27/2022 _____

City and state: _____ San Francisco, CA _____

/s/ Hakeem Oduniyi

*Complainant's signature*

Hakeem Oduniyi, DEA Special Agent

*Printed name and title*

*Judge's signature*

Hon. Alex G. Tse, U.S. Magistrate Judge

*Printed name and title*

## AFFIDAVIT IN SUPPORT OF COMPLAINT

I, Hakeem Oduniyi, a Special Agent of the Drug Enforcement Administration (the "Agency"), being duly sworn, hereby declare as follows:

## INTRODUCTION

1.      I make this affidavit in support of a complaint against Angel DAVID Rodriguez ("DAVID") for violations of 21 U.S.C. § 843(b) (unlawful use of a communication facility). DAVID is a professional drug dealer residing in the East Bay who makes a living by conspiring with others, including DARWIN MANCIA-MURILLO ("MANCIA"), to sell lethal narcotics— including fentanyl—in the Tenderloin neighborhood of San Francisco.

2.      This investigation is supported by physical surveillance, controlled purchases of narcotics, and wiretaps.  The wiretap interceptions, described below, show a network of individuals who spend all of their time dealing deadly drugs.

## AGENT BACKGROUND

3.      I am a Special Agent with the United States Department of Justice, Drug Enforcement Administration (DEA).  I have been employed with the DEA and assigned to the Oakland Resident Office since March 2020.  As a Special Agent of the DEA, I am an investigator and law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7).  I am empowered by law to conduct investigations, to execute search warrants, and to make arrests for offenses of Federal law, including drug offenses.  As a DEA Special Agent, I am authorized to investigate violations of United States law and am a law enforcement officer with the authority to execute warrants issued under the authority of the United States.

4.      I have attended various trainings regarding narcotics investigations, including a 14-week Basic Agent Training program where trainees are trained on surveillance techniques,

evidence processing, drafting drug affidavits, writing search warrants, and interview techniques. Trainees are also trained on drug identification, courtroom testimony, and Federal laws pertaining to the possession, sale, and distribution of illegal narcotics. I hold a B.S. degree in Criminal Justice Administration.

5.      I previously served as a Task Force Officer with Immigration Customs Enforcement, Homeland Security Investigations, Border Enforcement Security Task Force, Gulf Coast HIDTA Group. My parent agency was the Gulfport, Mississippi Police Department for approximately 6 years, where I held the rank of Detective in the Narcotics Division for approximately 3 years. While assigned as a HSI TFO, I investigated a multi-state drug trafficking organization that trafficked drugs to include MDMA, cocaine, cocaine base, and marijuana from Houston, TX, to Atlanta, GA. I also investigated over 10 illegal aliens for illegal entry into the United States as well as illegal aliens in possession of a firearm. While assigned as a Narcotics Detective, I conducted approximately over 195 drug investigations that included the illegal possession, sale, and trafficking of methamphetamine, cocaine, cocaine base, MDMA, pharmaceuticals, and marijuana as well as prescription fraud investigations. I also conducted robbery investigations, burglary investigations, and investigations of aggravated assaults.

6.      My primary duties as a Special Agent with the Drug Enforcement Administration include the investigation of organized narcotics traffickers. I have participated in numerous narcotics investigations, during the course of which I have conducted or participated in: physical and wire surveillances, including previous Title III investigations, undercover transactions, the introduction of undercover agents, the execution of search warrants, debriefing of informants, and reviews of taped conversations and drug records. I have also been the Affiant for federal search warrants and arrest warrants. Through my training, education, and experience, I have become

2

familiar with the manner in which illegal drugs are transported, stored, and distributed and the methods of payment for such drugs. I have become familiar with conduct common among drug traffickers such as the concealment of monetary and non-monetary drug proceeds, the use of various conveyances to transport and traffic illegal narcotics, and the use of modern technology to aid in the growth and expansion of the drug trafficking organization.

7.      I have performed and continue to perform various duties, which include, but are not limited to:

     a.  Working in an undercover capacity principally for the purpose of purchasing drug evidence from wholesalers of illegal drugs.

     b.  Working in the capacity of a surveillance agent detecting and recording movement of persons known to be or suspected of being involved in the illegal drug trafficking business.

     c.  Working as a case agent directing the investigation of various illegal drug traffickers and their organizations.

     d.  Directing investigations involving complex conspiracies in which numerous drug traffickers located in various states, and foreign countries were working in concert to illegally import, possess and distribute illegal drugs within the United States.

8.      Collectively, I possess a total of approximately 8 years' worth of knowledge, training, and experience in law enforcement, which encompasses enforcing criminal statutes and conducting investigations.

9.     I am an investigator and law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7).  I am empowered by law to conduct investigations, to execute search warrants, and to make arrests for offenses of Federal law, including the Target Offenses.

## SUMMARY OF PROBABLE CAUSE

**A.     October 2021: the San Francisco Police Department executes a warrant at an Oakland residence and finds ISMAEL and MANCIA along with guns, loaded high-capacity magazines and over 6 pounds of fentanyl**

10.     On October 13, 2021, the San Francisco Police Department executed a state search warrant at a single-family residence at 3480 38th Avenue in Oakland, California.  The state search warrant authorized the search of the residence, the person of EDIN ISMAEL RODRIGUEZ-CARTAGENA ("ISMAEL"), and two vehicles including a Honda Civic mentioned below.

11.     A few hours before executing the search warrants, officers observed DARWIN MANCIA-MURILLO ("MANCIA") exit 3480 38th Avenue's front door and enter the driver's seat of a Honda Accord.  MANCIA drove to the area of 4880 Santa Rita/2301 High Street in Oakland and entered a side door of this residence.  SFPD had seized narcotics from this residence back in 2018, and concluded it was a narcotics safehouse.  A short time later, MANCIA drove the Honda Accord back to 3480 38th Avenue.

12.     At about 3:23 p.m., officers observed ISMAEL, a 28-year-old convicted felon who is in the country illegally, exit 3480 38th Avenue.  ISMAEL walked toward a black 2017 Honda Civic, which law enforcement had seen him operating during prior surveillance.  ISMAEL entered the driver's seat.  At that point, officers moved in and detained and handcuffed ISMAEL.  As

ISMAEL was moved away from the black Honda Civic, an extended high-capacity magazine that was loaded with 9 mm ammunition fell out of ISMAEL's pants leg to the ground.[1]

13.    Body-worn camera footage from the incident captured ISMAEL, despite being handcuffed, manipulating the loaded extended magazine in the right side of his waistband area; the footage captured ISMAEL opening his hands and releasing the magazine, causing it to fall down his pants leg to the ground.  The following is a photograph of the magazine:



14.    The black Honda Civic was searched.  A black 9 mm semi-automatic pistol – specifically, a Polymer 80 "ghost gun" – was found underneath the driver's seat.  (Ghost guns are unserialized – and therefore essentially untraceable – firearms that can be bought online and

---

[1] A high-capacity magazine is a magazine that can hold more than 10 rounds of ammunition.  It is illegal under California law to possess a high-capacity magazine.

assembled at home.)  The pistol had no serial number and there was no magazine inside of the

pistol's well.  The following is a photograph of the pistol:



15.     An officer searched a green satchel that ISMAEL had been wearing.  The satchel

contained approximately $4,851 in cash.  I know from training and experience that narcotics

traffickers routinely conduct their business in cash, and often carry large amounts of cash on their

person.  The satchel also contained a cellphone that had been used to order narcotics from a telephone that was targeted in a federal wiretap.  The cellphone was assigned call number (702) 689-0235.  Law enforcement determined that ISMAEL was the user of (702) 689-0235 based on its investigation, including a ghost call described in Footnote 2.[2]

16.     Officers entered the premises of 3480 38th Avenue and found a number of adults and children, including an infant, inside of the living room.  MANCIA was located in the rear of the house.

17.     Law enforcement determined the front bedroom was occupied by MANCIA, his wife, and a 17-year-old male who appeared to be possibly disabled.  Inside the closet located closest to the bed that MANCIA and his wife said they slept in, an officer found a bag containing a large amount of men's clothing.  Inside of the bag, amongst the men's clothing, an officer found a black 9 mm semi-automatic pistol without a magazine in the well.  The pistol was a ghost gun;

---

[2] During surveillance on September 29, 2021 and prior to executing the search warrants, SFPD officers observed ISMAEL operating a Honda CRV and parked at a Walgreens located at 3232 Foothill Boulevard, Oakland, CA.  SFPD officers observed ISMAEL in the driver's seat of the vehicle.  SFPD officers placed a "ghost" call to phone number (702) 689-0235, a number that was intercepted during a separate DEA wiretap investigation.  (In a ghost call, law enforcement places a telephone call to a phone number of interest; law enforcement, which has set up simultaneous surveillance on the person believed to be the phone's user, then observes who picks up the ruse telephone call that law enforcement placed.)  Upon placing the call, officers observed ISMAEL answer the phone, leading law enforcement to conclude ISMAEL was the phone's user.

I later listed to the intercepted recordings of telephone calls over (702) 689-0235.  I compared the voice of the user of (702) 689-0235 to the voice that was intercepted, in May and June 2022, using a separate phone number, (707) 561-1378.  (Various intercepts from May and June 2022 over the (707) 561-1378 phone number are described below.)  I believe the voice intercepted over both phone numbers, (702) 689-0235 and (707) 561-1378, were one and the same.  Based on the ghost call described above, and given the fact that the voice over both telephone lines was the same, I believe ISMAEL was the user of both telephone lines.

Additionally, DEA linguists compared the voice intercepted over (707) 561-1378 to a voice intercepted over another number, 720-716-1550, which was also intercepted over the May and June 2022 wiretap (see below).  The voice was also ISMAEL's, leading me to conclude he used all three phone numbers referenced in this footnote.

it had no serial number.  In the same bag, the officer found a loaded extended high-capacity magazine containing several rounds of 9 mm ammunition.  Over $15,000 in cash was found in various parts of the bedroom.  The officer also located multiple grocery bags full of suspected Mannitol, which is used as "cut" to cook fentanyl.

18.     MANCIA was *Mirandized* and interviewed.  The conversation was in Spanish.  He admitted the room that contained the firearm was his.  He claimed to have no knowledge of the firearm or loaded magazine.  He stated he had lived in the house and the bedroom for one month. When asked if his fingerprints would come back on the firearm, he said, "I don't know."

19.     A black backpack was found in the enclosed backyard patio.  It contained the following:

      a.   3.73 pounds (1,702.3 gross grams) of suspected fentanyl;

      b.   45.5 gross grams of suspected methamphetamine;

      c.   7.6 gross grams of cocaine;

      d.   Two digital scales with white residue; and

      e.   Several notebooks that appeared to be pay-owe sheets (they had names and numbers on them, several of which had been crossed out).

20.     An outdoor shed alongside of the residence at the rear of the drive was searched.  It contained the following:

      a.   2.43 pounds (1,110.2 gross grams) of suspected fentanyl; and

      b.   7.3 gross grams of heroin.

21.     The fentanyl that was seized was tested with a TruNarc Analyzer; it tested positive for the presence of fentanyl.  The seized fentanyl consisted of the following colors: white, purple, orange, and pink.  I know from training and experience that fentanyl is dealt in various colors.

8

22.     I also know that possession of the above amounts of fentanyl and methamphetamine is consistent with further distribution, not personal use.  In fact, the fentanyl above – a total of approximately 6.2 pounds or 2.813 kilograms – contained approximately 1,406,500 lethal doses.[3] In addition, I know that drug dealers often use pay-owe sheets – essentially ledgers – to track their narcotics sales and that they use digital scales to weigh out the drugs they wish to purchase or sell.

**B.     ISMAEL and MANCIA are captured on federal wiretaps conspiring to distribute narcotics**

23.     In 2022, during the course of an investigation targeting drug dealers operating in the Tenderloin district in San Francisco, the DEA obtained two wiretaps targeting multiple telephones.

24.     The first wiretap, authorized by the Honorable Vince Chhabria and operational in February and March 2022, targeted two telephones (telephone numbers (510) 395-0049 and (510) 695-6803 (PIZARRO's phone, "TT2")).  *See* No. 22-CR-90177 MISC VC ("first federal wiretap").

25.     The second wiretap, authorized by the Honorable Edward J. Davila and operational in May and June 2022, targeted three phones, one of which was used by MANCIA (telephone numbers (925) 812-4182; (720) 930-3471; and (510) 761-4590 (MANCIA's phone, "TT3")).  *See* No. 22-CR-90471 EJD ("second federal wiretap").

---

[3] *See* https://www.dea.gov/sites/default/files/2021-12/DEA-OPCK_FactSheet_December%202021.pdf, last visited July 9, 2022 (December 2021 publication stating that 2 mg of fentanyl is considered a deadly dose and that 4 out of 10 fentanyl-laced pills that DEA tests contain a potentially lethal dose).  Two milligrams of fentanyl are equivalent to a few grains of salt.

26.     As discussed below, the wiretaps establish that ISMAEL, MANCIA, and others conspired to distribute large amounts of narcotics including fentanyl.

### *First federal wiretap*

27.     During the first wiretap, ISMAEL, using telephone number 720-716-1550, was captured working with Hever Suarez, aka PIZARRO, to distribute narcotics.  Examples follow.

28.     On February 25, 2022 (TT2, 14:50:03), ISMAEL, using 720-716-1550, was caught discussing fentanyl ("yellow") with PIZARRO, as follows:

> *PIZARRO asked how things were with ISMAEL.  ISMAEL said he (ISMAEL) was told that PIZARRO was not working.  PIZARRO said he (PIZARRO) was not working with anyone and the only one (possibly narcotics) he (PIZARRO) was getting was the "yellow" one.  PIZARRO said he (PIZARRO) was getting [U/I] "yellow."  PIZARRO said he (PIZARRO) had been working with the colors and had work hours now, from 3-9.  ISMAEL asked how much PIZARRO was getting the "yellow" one for, PIZARRO said 2 bucks and it (yellow) was fire. ISMAEL referred to PIZARRO as Dormido [Sic] and asked if PIZARRO got some (possibly narcotics) for other people as well. . . .  PIZARRO said he (PIZARRO) was just going to go spread the word that there were some "flavors" (possibly narcotics) now fruit water. ISMAEL asked PIZARRO to send him (ISMAEL) PIZARRO's location and he (ISMAEL) would come over so they (ISMAEL and PIZARRO) could get on it (possibly start working) today, if possible. PIZARRO said okay, they (PIZARRO and ISMAEL) would be in touch.[4]*

29.     I know from training and experience that fentanyl now comes in various colors, and that yellow is one of those colors.  I know that drug dealers in the Tenderloin often work in shifts, and that drug activity picks up in the afternoon and evenings.  I also know that PIZARRO is a drug

---

[4] This is only a preliminary summary; it was prepared by DEA linguists who were interpreting intercepted communications during the course of the wiretap.  All other summaries in this affidavit are also only preliminary summaries.

dealer.  In fact, he was recently arrested on federal charges, and multiple bags of fentanyl with a gross weight of 628.9 grams, along with three handguns and other drugs, were found in PIZARRO's vehicle.  *See* 3:22-mj-70760 MAG, Doc. 10.

30.     On February 27, 2022 (TT2, No. 102), PIZARRO was captured making a call to ISMAEL, who was using 720-716-1550.  The following is a summary of their conversation:

> *PIZARRO said he (PIZARRO) received the package already.  ISMAEL asked if PIZARRO did already.  PIZARRO said yes, and told ISMAEL that he (PIZARRO) had gone to San Francisco already and . . . [U/I] to the first work so that he (worker) could get on it.  PIZARRO said that the way they (PIZARRO and others) were going to work was that as soon as the money would start coming out, PIZARRO would call ISMAEL so he (PIZARRO) could start making payments. ISMAEL said alright. PIZARRO told ISMAEL not to forget about the thing PIZARRO told ISMAEL that was for up there.  ISMAEL said yes and told PIZARRO that he (ISMAEL) would call him (PIZARRO) to let him (PIZARRO) know.*

31.     I know from my training and experience and knowledge of the investigation that PIZARRO, before his federal arrest, was a fentanyl trafficker who used various individuals – whom he called "pistoleros," which is Spanish for gunfighter – to help him distribute narcotics.  I believe that in this conversation, PIZARRO was telling ISMAEL that he had gone to San Francisco in order to help a worker begin selling drugs ("so that he (worker) could get on it").  I believe that ISMAEL had fronted drugs to PIZARRO on a credit basis, and that PIZARRO was telling ISMAEL that he would start making payments on those fronted drugs once PIZARRO and his associates began making money (by selling drugs).  The fronting of the drugs tends to show that PIZARRO and ISMAEL have a relationship of trust, likely built on prior successful drug transactions.

32.     On March 4, 2022 (TT2, No. 325), PIZARRO and ISMAEL (using 720-716-1550) talked about their drug runners – as stated, I know that PIZARRO called his drug workers "pistoleros" – and housing their runners.  I know from prior investigations that it is common for drug traffickers to house lower-level drug dealers who sell drugs on the streets of San Francisco.  An excerpt of their conversation follows:

> *ISMAEL said he (ISMAEL) was talking with some guys (possibly suppliers), and would let PIZARRO know if anything, about, about [U/I].  PIZARRO said okay, so PIZARRO could be better off.  PIZARRO said he (PIZARRO) did not even have a car.  PIZARRO said he (PIZARRO) had a room available for another "pistolero" (gunman, possibly worker), if ISMAEL had another "pistolero" (gunman, possibly worker).  PIZARRO said he (PIZARRO) was only living with a dude and with his (PIZARRO's) brother, but had to pay almost 3,000 bucks in rent.  PIZARRO said he wanted to bring people in (roommates), in order to move from there. PIZARRO said he (PIZARRO) wanted to get an apartment with his (PIZARRO's) wife (Carillo) and live alone, and bring people in (to current location). ISMAEL said okay, he (ISMAEL) would get on that.*

33.     This call indicated to me that ISMAEL, like PIZARRO, was using workers ("pistoleros") to help him (ISMAEL) distribute narcotics.  Their conversation also is consistent with the modus operandi of many drug dealers operating in the Tenderloin: they house workers in residences in the East Bay (mostly Oakland) who then travel to San Francisco to sell drugs.

34.     On March 17, 2022 (No. 1093), at 3:30 p.m., PIZARRO and ISMAEL (using 720-716-1550) had the following conversation during an approximately 3-minute telephone call:

PIZARRO said ISMAEL had left him (PIZARRO) waiting. ISMAEL said he (ISMAEL) was taking care of a dude (customer). PIZARRO said he (PIZARRO) had left already. PIZARRO said he (Flaco) had a guy (Flaco per call 1092) who wanted to work with ISMAEL but … [thought not finished by PIZARRO] PIZARRO said he (Flaco) wanted the same price as PIZARRO and he (PIZARRO) could not give him (Flaco) the same (price). PIZARRO said the guy (Flaco) had a house and everything, and 3, 3 "tiradores" (shooters/possibly workers). ISMAEL asked if for real. PIZARRO said yes, and said he (Flaco) needed 7 for right now. PIZARRO asked what ISMAEL wanted to do, if he (PIZARRO) should send him (Flaco) to ISMAEL, or if ISMAEL could hook him (PIZARRO) up (with a lower price). PIZARRO said that dude (Flaco) got out work for sure. ISMAEL said that was no problem, he (ISMAEL) would hook PIZARRO up (with the price). PIZARRO said he (Flaco) wanted 7 (possibly narcotics) right now and would get 15 the day after tomorrow. PIZARRO said the guy (Flaco) got work out as well. PIZARRO said the guy (Flaco) could give it (possibly narcotics) to him (Flaco) for the same (price) as ISMAEL (was giving) and he (PIZARRO) could just pass ISMAEL the [U/I]. PIZARRO asked how ISMAEL preferred to do it. ISMAEL said he (ISMAEL) would give PIZARRO a cut (of the profit). PIZARRO said okay.

PIZARRO said he (PIZARRO) was going to tell him (Flaco) that ISMAEL was going to give it (possibly narcotics) to him (Flaco) at the same price as him (PIZARRO's). ISMAEL said okay. PIZARRO said okay. ISMAEL said as long as PIZARRO [U/I], because PIZARRO knew that he (PIZARRO) [U/I]. PIZARRO said yeah and said the guy (Flaco) was loyal. PIZARRO said he (PIZARRO) would have the guy (Flaco) under control. ISMAEL said okay. PIZARRO said he (PIZARRO) was going to talk with him (Flaco) right now, so that the brother-in-law could arrange for 1/2 (possibly narcotics) to be taken to him (Flaco) of 1. ISMAEL said okay.

PIZARRO said he (PIZARRO) needed a car, because he (PIZARRO) was risking it with that van. PIZARRO said the registration tags on that van had expired as well and it was fucking tough. ISMAEL said he (ISMAEL) was going to go over to that dudes (third party) tonight to see, to see one (car) that he (third party) had. ISMAEL said he (ISMAEL) was going to tell him (third party) that he (ISMAEL) need a … [thought not finished by ISMAEL] ISMAEL said he (ISMAEL) would see if he (ISMAEL) could get rid of one (car) that he (car) had. PIZARRO said okay and said he (PIZARRO) was going to arrange that (deal) at once. ISMAEL said okay.

35.     I believe that in the foregoing conversation, PIZARRO was trying to connect an associate (FLACO) with ISMAEL, so that ISMAEL would supply him (FLACO) with drugs. I believe that PIZARRO explained that FLACO had three drug workers ("tiradores," which translates to shooters; I know that PIZARRO referred to his own drug workers as "pistoleros"), and that he (FLACO) needed seven units of a drug ("7 for right now"). I believe that PIZARRO was attempting to convince ISMAEL that FLACO was a person ISMAEL should work with because FLACO did a good job of selling drugs ("PIZARRO said the guy (FLACO) got work out as well"). I know that "work" is commonly used as code for drugs. I believe that ISMAEL and PIZARRO agreed that PIZARRO was going to reach out to FLACO for the purpose of arranging a narcotics transaction ("1/2 (possibly narcotics) to be taken to him (FLACO) of 1").

36.     Immediately following the call with ISMAEL (who was using 720-716-1550), at 3:33 p.m., PIZARRO contacted FLACO (TT2, No. 1094). They had the following conversation:

PIZARRO identified UM0749 as FLACO. PIZARRO said that "yellow fire" (possibly narcotics) was 200 bucks and asked if that was okay. FLACO asked if it (possibly narcotics) was good although it did not matter too much as long as … [thought not finished by FOLACO]. PIZARRO said of course. PIZARRO told FLACO that "work" (yellow, possibly narcotics) would not be returned. PIZARRO said he (PIZARRO) was going to get a 1/2 for the meantime and if there were any problems, he (PIZARRO) would take it (work) back. FLACO said yeah. PIZARRO said the dude (Ismael) had raised it (price) to that (200) because it was good (quality) "work" (possibly narcotics) and (had) all the colors. PIZARRO said they (PIZARRO and FLACO) would work with the guy (Ismael). PIZARRO said FLACO could return any "work" (possibly narcotics) that he (FLACO) did not like. PIZARRO said he (PIZARRO) had not had any problems with that guy's (Ismael's) "work" (possibly narcotics), because he (PIZARRO) always told him (Ismael) to make it (possibly narcotics) fire. PIZARRO said he (PIZARRO) did not like "work" (possibly narcotics) to be returned to him (PIZARRO). FLACO said that was for sure. FLACO said he (FLACO) had given it (possibly narcotics) like that (at that price), but it did not matter, the point was not to lose. PIZARRO said as long as people were happy, but later [U/I] [Audio glitch] "animal" (possibly narcotics) at 250. PIZARRO said he (PIZARRO) even sold it at 3 (300) because that "animal" (possibly narcotics) was not rejected by anyone. FLACO said yeah. PIZARRO said he (PIZARRO) was able to get all of the colors, so FLACO could have all of them (colors). FLACO said yeah. PIZARRO said because if FLACO only had "yellow" (possibly narcotics), it was no good. PIZARRO said FLACO had to have them all. FLACO said yeah. PIZARRO said for FLACO to let him (PIZARRO) know when FLACO wanted it (possibly narcotics) to be dropped off. FLACO said he (FALCO) was heading to Oakland (California) right now. PIZARRO told FLACO to call him (PIZARRO) once FLACO was home and PIZARRO would have it (possibly narcotics) dropped off. FLACO said okay. PIZARRO told FLACO just to receive it (possibly narcotics) and would deal with PIZARRO later. FLACO said okay. PIZARRO said they (FLACO and PIZARRO) would talk in the afternoon when he (PIZARRO) arrived there (possibly block). FLACO said okay. EOC

37.    Based on the content of the conversation and the sequence of the two calls, I believe that in this call, PIZARRO was talking with FLACO about ISMAEL.  In the call, PIZARRO told FLACO he was going to obtain ½, which is what PIZARRO told ISMAEL he wanted to obtain in their prior call (No. 1093).  During the call, PIZARRO described how ISMAEL had raised his drug prices ("the dude (ISMAEL) had raised it (price to that (200) because it was good (quality) 'work'").  I know from training and experience that work is often used as code for drugs.  I believe PIZARRO and FLACO were discussing fentanyl specifically due to the reference to "yellow fire." As stated, fentanyl comes in yellow, among other colors.  I also know that drug dealers often describe high-quality fentanyl as "fire."  The fact that PIZARRO told FLACO that he (FLACO) would be able to return to ISMAEL any drugs he did not like ("PIZARRO said FLACO could return any 'work' . . . that he (FLACO) did not like") indicates to me that PIZARRO and ISMAEL have a long-standing, drug-based relationship.  I also know from training and experience that drug dealers often describe fentanyl as "animal."

38.    During a call at 3:37 p.m. (TT2, No. 1096), FLACO was captured on the wiretap asking PIZARRO if ISMAEL had any red, purple, or grey fentanyl (as stated, fentanyl comes in various colors, including these ones).  PIZARRO said he would check.  Their conversation follows:

FLACO to PIZARRO

FLACO asked if he (referring to Ismael, per call # 1094) happened to have any of the red, purple and grey (possibly narcotics). PIZARRO said he (PIZARRO) would check for FLACO. PIZARRO said he (PIZARRO) was certain the red and purple (possibly narcotics) were available, but if not he (PIZARRO) had some red (possibly narcotics) at his (PIZARRO's) house. FLACO said okay. PIZARRO asked how much of the red (possibly narcotics) FLACO needed. FLACO said he (FLACO) needed 2 red and 2 purple (possibly narcotics). PIZARRO said okay and he (PIZARRO) would check for FLACO. FLACO said if the grey (possibly narcotics) was available that would be better. PIZARRO said all right and he (PIZARRO) would check on the grey (possibly narcotics) .

39.     In a call later that night (March 17), which took place at about 9:07 p.m. (TT2, No. 1111), PIZARRO told ISMAEL, who was using 720-716-1550, that the area was hot – in other words, had a high law enforcement presence – which made it tough to "work" (sell drugs). Furthermore, PIZARRO told ISMAEL that the guy (likely FLACO) liked the fentanyl that ISMAEL had supplied to FLACO (through PIZARRO) but that FLACO wanted a cheaper price. In addition, among other things, ISMAEL and PIZARRO discussed the yellow fentanyl, which PIZARRO described as having the "perfect touch."  PIZARRO and ISMAEL further discussed supplying FLACO more fentanyl, and PIZARRO told ISMAEL he would let ISMAEL know if anything comes up.  Their conversation follows:

ISMAEL to PIZARRO

PIZARRO asked ISMAEL what he (ISMAEL) was up to. ISMAEL said he (ISMAEL) was just chilling. PIZARRO said the street was hot (possibly law

| Case Name | Call Number | Target | Date | Time | Duration | Direction | Contact ID | Contact Name |
|---|---|---|---|---|---|---|---|---|

enforcement presence). ISMAEL asked if really. PIZARRO said it was exaggerated, like they (law enforcement presence) did not want to let them (PIZARRO and others) work. ISMAEL said it was hot. PIZARRO said it (law enforcement presence) was too much and made it tough (to work).

PIZARRO told ISMAEL the guy (Flaco) did like the "work" (possibly narcotics) but he (Flaco) wanted a cheaper price. PIZARRO said he (PP) told him (Flaco) PIZARRO did not even get it (possibly narcotics) at that price. PIZARRO said that according to him (Flaco), they (third party) liked the 10 (possibly narcotics) PIZARRO gave him (Flaco), he (Flaco) was able to get them (10, possibly narcotics) out, and would like 10 (possibly narcotics) more for tomorrow. PIZARRO said that because he (Flaco) was giving it (possibly narcotics) to another guy, he (Flaco) claimed he (Flaco) was not making a profit. PIZARRO said that supposedly Flaco did not make any profit (this time) because it (possibly narcotics) was some "work" that he (Flaco) had to switch (possibly narcotics). ISMAEL said okay. PIZARRO said he ( PIZARRO) that was the price he (PIZARRO) was given and was not making any profit out of it. ISMAEL said his brother was working there too and he (Ismael) was giving it (possibly narcotics) to him (ISMAEL's brother) a little more expensive. PIZARRO said he (PIZARRO) told the guy (Flaco) that he (PIZARRO) did not think it (price) would change. PIZARRO said the guy (Flaco) liked the "work" and that PIZARRO got only one complain, but had already talked to the brother-in-law about it. PIZARRO said he (PIZARRO) had not gotten out the orange and the green "animals" (possibly narcotics), he ( PIZARRO) still had like 8 or 9 (possibly narcotics). ISMAEL said okay. PIZARRO said he (PIZARRO) was going to ask the guys what the issue was. ISMAEL said to talk to him (brother-in-law) and ask him (brother-in-law) what he (brother-in-law) would like. PIZARRO said if really. ISMAEL said PIZARRO could tell him (brother-in-law) if there is a problem with the color or something. ISMAEL said the "yellow" (possibly narcotics) could not be change because that was the color it was supposed to be. PIZARRO said the "yellow" (possibly narcotics) had the perfect touch.

PIZARRO said he (PIZARRO) was going to tell the guy that it was not going to be possible. ISMAEL said he (ISMAEL) was giving PIZARRO preference. PIZARRO said he (PIZARRO) told him (Flaco) he (Flaco) would be working with PIZARRO, but PIZARRO told him (Flaco) he (PIZARRO) was getting it (possibly narcotics) at the same price. PIZARRO said he (Flaco) would need 10 (possibly narcotics) more for tomorrow but PIZARRO did not think [U/I] (at that price). ISMAEL said no way. PIZARRO said maybe if he (Flaco) was willing to pay less for a larger (amount). ISMAEL said for sure. PIZARRO said he (PIZARRO) was going to tell him (Flaco) that it was not possible. PIZARRO said PIZARRO was going to wait for him (Flaco) to come back because he (PIZARRO) met him (Flaco) on the street. ISMAEL said okay. PIZARRO said he (PIZARRO) would let him (ISMAEL) know if anything comes up. ISMAEL said okay.

PIZARRO said for ISMAEL to let him (PIZARRO) know about the car. ISMAEL said he (ISMAEL) will get on it and would let PIZARRO know tomorrow after he (ISMAEL) gets back from his court (appointment). PIZARRO said okay. EOC

15

40.     PIZARRO and ISMAEL had other communications captured on the first federal wiretap like the ones above, tending to establish that PIZARRO and ISMAEL were working together to distribute fentanyl.

### *Agents establish that MANCIA is the user of Target Telephone 3*

41.     On or about March 22, 2022, agents were conducting surveillance of MANCIA. They observed MANCIA driving a 2004 gold Honda Accord bearing California license plate 8WQJ442. Agents observed MANCIA park and walk to an unknown residence near the intersection of Santa Rita Street and High Street.  Moments later, agents observed MANCIA enter the driver seat of the gold Honda Accord and observed a subject later identified as DAVID. Soon thereafter, agents observed the gold Honda Accord depart toward High Street.

42.     Officers with the Oakland Police Department then conducted a traffic stop on the gold Honda Accord for traffic violations and identified both occupants inside of the vehicle. The driver was identified as MANCIA and the front passenger was identified as Angel DAVID Rodriguez. Agents noted that GPS location data obtained for a previous telephone number belonging to MANCIA was in the same vicinity as the traffic stop location.

43.     I later listened to intercepted recordings of telephone calls over (510) 761-4590 (Target Telephone 3, discussed below). I compared the voice of MANCIA during the traffic stop on March 22, 2022, to the voice that was intercepted in May and June 2022 over Target Telephone 3. I believe Mancia's voice during the traffic stop and the voice that was intercepted over Target Telephone 3 are one and the same. Based on these facts, I believe MANCIA was the user of Target Telephone 3.

### *Second federal wiretap*

44.     On May 10, 2022, the Honorable Edward J. Davila, in No. CR22-90471 MISC EJD, issued an order authorizing the interception of wire communications over (510) 761-4590 ("**Target Telephone 3**"), used by MANCIA.   The next day, the DEA began intercepting communications over **Target Telephone 3**.

45.     The second federal wiretap established that ISMAEL was working with MANCIA and others to distribute fentanyl. Examples of their communications follows.

46.     On May 12, 2022, at about 8:36 p.m. (TT3, No. 71), MANCIA and ISMAEL (still using 720-716-1550) had the following conversation:

ISMAEL to MANCIA

ISMAEL said it (possibly narcotics) was good. MANCIA said [U/I]. ISMAEL said he (third party) sent a video [U/I]. MANCIA said yes. ISMAEL said Pipe needed "liquid" (possibly narcotics). MANCIA asked how much. ISMAEL said about 2 and that he (ISMAEL) had told him (possibly Pipe) that when they (ISMAEL and others) would [U/I] and the guy (third party) said. ISMAEL said he (third party) had told ISMAEL he (third party) was going to give it (possibly narcotics) to him (ISMAEL) [U/I]. MANCIA said okay.

MANCIA asked ISMAEL if that dude (fourth party) was going to come soon. ISMAEL said he (ISMAEL) had called him (fourth party) and he (fourth party) said [U/I] a little more. ISMAEL asked where MANCIA was heading right now. MANCIA said he (MANCIA) was going to go see Brian and that he (MANCIA) almost sold him (possibly Brian) 7. MANCIA said [U/I]. ISMAEL asked if really. MANCIA said he (MANCIA) was going to head home to tell him (possibly fifth party). MANCIA said [U/I] party) had told MANCIA that he (possibly fifth party) was going to stop by. ISMAEL said that guy, Chacal was calling him (ISMAEL) and told him (ISMAEL) that as soon as they (possibly Chacal, ISMAEL and others) had 20, to pay him (possibly sixth party) all at once. MANCIA said Dominio [PH] was supposed to call MANCIA as well. ISMAEL said they (ISMAEL and MANCIA) should gather about 20 (20,000) and give it to him (possibly sixth party). MANCIA said okay. ISMAEL told MANCIA to see if it was possible to [U/I] another one. ISMAEL said, ISMAEL said that if they (ISMAEL and MANCIA) pay him (possibly fifth party) that one (possibly narcotics), then they could ask him (possibly fifth party) to bring them (ISMAEL and MANCIA) one (possibly narcotics). ISMAEL said this way even though they (ISMAEL and MANCIA) only get one (possibly narcotics), they (ISMAEL and MANCIA) could be selling 3 of [U/I]. MANCIA said yeah, because everything (possibly narcotics) was there. MANCIA said there was plenty right now, 5 kilos (possibly narcotics) from last time and 3 (possibly narcotics) more cleaned one that just arrived.

ISMAEL asked how many more were left from last time. MANCIA said like 5 (possibly kilos of narcotics). ISMAEL asked if there were all "yellow" (possibly narcotics). MANCIA said no, there were about 5 1/2 (possibly kilos of narcotics) total and 2 of them were the colored ones (possibly narcotics). ISMAEL asked MANCIA if they (ISMAEL and MANCIA) could get 20 (20,000) out of (selling) those 3 (possibly narcotics), so that it (20, 000) could be sent out to him (possibly fifth party). MANCIA said yes, there was plenty (possibly narcotics) and Moquiro (Abraham) owed MANCIA a whole one (possibly narcotics). ISMAEL asked about Ole [PH]. MANCIA said he (Ole) owed MANCIA a lot, he (Ole) owed 10,000 of the "M" (possibly narcotics). MANCIA said this was separate from the rest of the "black" one (possibly narcotics) and the "cleaned " ones he (Ole) owed him (MANCIA). ISMAEL said okay and told MANCIA to get on it (possibly collecting the money), because he (ISMAEL) wanted to send 10,000 to that guy (possibly sixth party). ISMAEL said he (ISMAEL) would send it until the one from over there was [U/I]. MANCIA said uh-huh.

ISMAEL said this week was a little slow. MANCIA said that guy also [U/I] for a while and told ISMAEL to ask the guy what day it was. ISMAEL said yes. MANCIA said the guy had said that they had barely started to work again. ISMAEL asked if that was so. MANCIA said he ( MANCIA) was going to go right now to [U/I]. ISMAEL said to tell him (possibly fifth party) that there was all that stuff, so that they (fifth party) could get more "yellow" ones (possibly narcotics).

ISMAEL told MANCIA that once there were 15 or 20, they (ISMAEL and MANCIA) could send it out. MANCIA said okay. ISMAEL asked MANCIA to call Pipe. MANCIA said okay and asked if [U/I] had that (possibly narcotics) and ISMAEL said yes. MANCIA asked how many he (MANCIA) should bring him (Pipe). ISMAEL said 2 (possibly narcotics) and asked if he (ISMAEL) should make more. MANCIA said that was fine. ISMAEL asked MANCIA to call him (ISMAEL). MANCIA said he (MANCIA) would call once he (MANCIA) would head out there. EOC

47.     I believe that "liquid" was a possible reference to methamphetamine, as methamphetamine can take a liquid form.   The reference to "2" indicates to me that MANCIA and ISMAEL were talking about drugs, because drug dealers frequently talk in units when discussing drugs.   I believe the references to "7," "20," sales, and payments were all related to drug dealing. I believe that MANCIA and ISMAEL were discussing major quantities of drugs ("5 kilos"), and that MANCIA had in his possession 5 kilograms of drugs (likely fentanyl, as that is what MANCIA

17

and ISMAEL primarily dealt according to the wiretap intercepts) plus another 3 kilograms ("3 (possibly narcotics) more cleaned one that just arrived").  I believe that MANCIA and ISMAEL were talking about fentanyl in particular due to the references to "yellow" and "colored ones."  As stated, fentanyl comes in various colors (whereas other drugs sold in the Bay Area do not).  I believe that ISMAEL was instructing or telling MANCIA to collect money from previously-fronted drugs ("ISMAEL said okay and told MANCIA to get on it . . . because he (ISMAEL) wanted to send 10,000 to that guy (possibly sixth party).")  The remainder of the call involved a discussion of distributing and selling drugs.  This conversation in particular indicates to me that MANCIA and ISMAEL had a close relationship and were distributing narcotics together.

48.     In the following calls from May 12, 2022 (TT3, Nos. 74 and 77), ISMAEL, using 720-716-1550, and MANCIA coordinated a meeting with a third party, indicating to me that ISMAEL and MANCIA were clearly working together:

| 05/12/2022 22:52:17 | 74 | TT3- Darwin MANCIA-Muriello | (510) 761-4590 | Incoming | ISMAEL | (720) 716-1550 | Voice | 00:00:30.578 | Pertinent | | Sy Co |
|---|---|---|---|---|---|---|---|---|---|---|---|

ISMAEL to MANCIA

ISMAEL told MANCIA that the guy (third party) was going to arrive there, like the other [U/I], over there by Santa Rita and 32nd. MANCIA said okay. ISMAEL said he (third party) would be there in 10 minutes. MANCIA said okay.

| 05/12/2022 23:22:26 | 77 | TT3- Darwin MANCIA-Muriello | (510) 761-4590 | Incoming | ISMAEL | (720) 716-1550 | Voice | 00:00:38.152 | Pertinent | Synopsis or Summary Complete | Spanish |
|---|---|---|---|---|---|---|---|---|---|---|---|

ISMAEL to MANCIA

ISMAEL asked if there was a Honda car and MANCIA said yes. ISMAEL said it was another car. ISMAEL said the guy was there and asked MANCIA if he (MANCIA) had his (guy's) number. MANCIA asked if ISMAEL was the same as last time. ISMAEL said yes. MANCIA said he (MANCIA) was going to call him (guy) because MANCIA was there already. ISMAEL said to call him (guy) and to give him (guy) the address so that he (MANCIA) could tell him (guy) where MANCIA was. MANCIA said okay. EOC

49.     Based on my knowledge of the investigation, I believe the foregoing calls involved the coordination of a drug-related meeting with a third party.

50.     In a call on May 13, 2022, which took place at about 6:02 p.m. (TT3, No. 108), ISMAEL (using 720-716-1550) warned MANCIA to "be careful" as a third party had been detained in a particular area ("on 85th").  I believe that ISMAEL and MANCIA were concerned

about law enforcement's presence (because law enforcement detains individuals). I further believe that this call tends to show the close working (and possibly familial) relationship between ISMAEL and MANCIA. The call follows:

**ISMAEL to MANCIA**

ISMAEL referred to MANCIA as brother in law. MANCIA told ISMAEL to go ahead. ISMAEL told MANCIA to be careful around there, because Caco was detained yesterday over where [U/I] lived. MANCIA asked if on 85th. ISMAEL said yes, last night in the afternoon. MANCIA said when he (MANCIA) comes back, he (MANCIA) would always leave the car on the other side at the alley further up. ISMAEL said yes and told him (MANCIA) to be on the look out if anything. MANCIA said alright. EOC

51.    In a call from May 14, 2022 (TT3, No. 166), ISMAEL, using 720-716-1550, was captured asking MANCIA to pay the "other phone" – a phone "ending in 2591" – when MANCIA went to Metro (a well-known service provider). The call follows:

**ISMAEL to MANCIA**

ISMAEL asked MANCIA to pay the other phone when MANCIA went to Metro. MANCIA asked if the other one (phone). ISMAEL said yes, the one there, the one he (ISMAEL) had always used. ISMAEL said the one (phone number) ending in 2591. MANCIA said okay, he (MANCIA) would pay it (2591 phone) when he (ISMAEL) passed by Metro. MANCIA said okay. EOC

52.    I know from training and experience that drug dealers like ISMAEL frequently use multiple phones to carry out their drug dealing, often in an attempt to thwart law enforcement who may be trying to intercept their communications. I believe the foregoing call further confirms the close working relationship MANCIA and ISMAEL had with one another.

53.    In another call from May 14, 2022 (TT3, No. 199), ISMAEL (using 720-716-1550) and MANCIA were caught discussing whether a third party had paid MANCIA (again, drug dealers often front drugs on credit and collect payment later). ISMAEL told MANCIA to "get them . . . on it," likely meaning that MANCIA should work to collect the payment. I believe the call involved drugs in particular and drug-related money due to MANCIA's reference to "quantity" and "weight." The call follows:

ISMAEL to MANCIA

ISMAEL asked if they (MANCIA and others) took everything over there (possibly stash house per call#'s 190, 191) and if they (MANCIA and others) had all the "check" (possibly money) over there. MANCIA said yes, all the "check" (possibly money) was over there. ISMAEL asked if they (third party) had paid him (MANCIA). MANCIA said not yet. ISMAEL told MANCIA to get them (third party) on it, because by this week he (ISMAEL) wanted [U/I]. MANCIA said this week, yes, and told ISMAEL there was always some there, not the quantity, but the weight was always there. MANCIA said there was always something dropping, but a little bit each day. ISMAEL said alright and told MANCIA he (ISMAEL) would call him (MANCIA) back. EOC

54.     On May 16, 2022 (TT3, No. 267), ISMAEL (using 720-716-1550) and MANCIA were once again captured discussing drugs.  ISMAEL said "1 of the 'clean' one" was going to be needed.    Drug dealers often talk in particular quantities and describe higher-quality or unadulterated drugs as "clean."  ISMAEL was also captured saying that someone was going to "go drop off some 'work,'" which is a clear reference to drugs, as I know drug dealers use the term "work" as code for drugs.  The call follows:

ISMAEL said the brother-in-law was going to need 1 of the "clean" one (possibly narcotics). MANCIA asked where he (brother-in-law) was. ISMAEL said he (brother-in-law) was with him (ISMAEL) at his (ISMAEL's) house. MANCIA said he (MANCIA) just got on the freeway heading to San Pancho (San Francisco, California). [Aside: ISMAEL asked UM (possibly brother-in-law) when he (brother-in-law) needed it ("clean" one, possibly narcotics). UM said [U/I].] ISMAEL said in an hour and a half. MANCIA said he (MANCIA) would be home by then. ISMAEL said okay. [Aside: ISMAEL told UM (brother-in-law) that he (possibly MANCIA) was going to go drop off some "work" (possibly narcotics) in San Francisco. UM (brother-in-law) said [U/I].] MANCIA said he (MANCIA) could get off the freeway again, but ISMAEL said it was fine. ISMAEL told MANCIA to have it ready when he (MANCIA) got back (from San Francisco, California), so that [U/I] (possibly brother-in-law) could go there (possibly MANCA's house) pick it (1 "clean" on) up. MANCIA said okay. EOC

55.     On May 18, 2022 (TT3, No. 399), MANCIA was captured discussing ISMAEL with another individual, "ABRAHAM."  Furthermore, MANCIA and ABRAHAM appeared to be discussing methamphetamine (calling it "water," which is commonly used as code for methamphetamine), and how ABRAHAM could bring ISMAEL "3-4," which is likely a reference to money.  MANCIA told ABRAHAM to bring "3," and ABRAHAM confirmed.  The call, which confirms how MANCIA and ISMAEL were working together, follows:

MANCIA referred to UM9972 as Abraham and asked if he (ABRAHAM) had money. MANCIA said Ismael told him (MANCIA) to ask him (ABRAHAM) what was going on, because Chacal had been saying (possibly promising money) for days. ABRAHAM asked how much he (Ismael) needed and said he (ABRAHAM) knew he (ABRAHAM) owed him (possibly to Ismael) 1, but reminded MANCIA about his (ABRAHAM's) deal with the "water" (possibly narcotics) ending badly. ABRAHAM asked how much Chento [PH] (Ismael) needed. MANCIA said he (MANCIA) did not know. ABRAHAM said he (ABRAHAM) could bring him (Ismael) 3-4 (possibly 3,000 or 4,000), because he (ABRAHAM) wanted to go down there. MANCIA told ABRAHAM to bring him 3 (possibly 3,000) and then [U/I]. ABRAHAM said he (ABRAHAM) would come by later. [Call dropped] EOC

56.     Later that day (TT3, No. 410), MANCIA was captured telling ABRAHAM that he had the "product" – which was a clear reference to drugs, as dealers frequently use "product" as code for drugs.  ABRAHAM said he would arrive shortly, as follows:

MANCIA to ABRAHAM

ABRAHAM asked where he (ABRAHAM) was. MANCIA said he (MANCIA) was on 38th and Santa Rita. ABRAHAM said he (ABRAHAM) would be there soon. MANCIA asked where ABRAHAM was. ABRAHAM said he (ABRAHAM was on... [thought was not finished by ABRAHAM] MANCIA said it (possibly narcotics) was good and that it (possibly narcotics) was something (possibly narcotics) he (ABRAHAM) would be very interested in it (possibly narcotics). ABRAHAM said okay. MANCIA said he (MANCIA) had the product (possibly narcotics) with him (MANCIA) so that ABRAHAM could see it (possibly narcotics). ABRAHAM said he (ABRAHAM) would be there shortly. EOC

57.     On May 20, 2022 (TT3, No. 459), MANCIA was caught being asked for "1/2 of 'yellow'" – in other words, half a unit of yellow fentanyl.  During the remainder of the call, MANCIA discussed payment.  The call follows:

MOCO to MANCIA

MOCO said he (MOCO) needed 1/2 of "yellow". MOCO said [U/I] (third party) was there and said he (MOCO) would send MANCIA 200 bucks. MOCO asked if they (MOCO and MANCIA) were at 420 (outstanding balance). MANCIA said yes and asked if David [PH] was there. MOCO said yes. MANCIA said to have him (David) give it (1/2 of yellow) to MOCO and to ask him (David) to hurry up. MOCO said he (MOCO) was going to send MANCIA 200. MANCIA said okay and said [U/I]. MOCO asked if 80, MANCIA said yes to the rest (remaining balance). MOCO asked if they (MANCIA and MOCO) would be left at 240. MANCIA said yes, they (MOCO and MANCIA) could add the 1/2 later and do the math later, once he (MANCIA) went over. MOCO said okay. MANCIA told MOCO to tell David [PH] to hurry it up a bit. EOC

58.     On May 20, 2022 (No. 460), MANCIA was asked by an unknown caller to bring the caller the "colors" – a likely reference to fentanyl – that "ISMAEL had mentioned."  This further confirmed for me how MANCIA and ISMAEL were working together to distribute fentanyl.  Also during the call, MANCIA was caught discussing passports and how MANCIA needed passports for himself and his wife.  I know from training and experience, including this investigation, that drug dealers often take steps (here, by obtaining passports) that would allow them to flee to their home country on a moment's notice.  MANCIA ended the call by saying he would come with "that" (likely the fentanyl).  The call follows:

UM3867 to MANCIA

UM3867 asked MANCIA to bring him (UM3867) the colors that Ismael had mentioned. MANCIA asked how many he (Ismael) had said he (MANCIA) was going to take to UM3867. UM3867 said he (Ismael) had not told him (UM3867) anything and told MANCIA to ask him (Ismael). MANCIA said okay and said he (MANCIA) was just going to go fill up the well and would come by to UM3867's (location).

UM3867 said he (UM3867) had his (UM3867) passport now and could take MANCIA over to the woman who helped him (UM3867) get it (passport). Social conversation continued about MANCIA needing to get his (MANCIA's) and his (MANCIA's) wife's passport. UM3867 said he (UM3867) had gotten it (passport) today. MANCIA asked when UM3867 had gone to apply for it (passport), UM3867 said this morning. MANCIA asked if UM3867 got it (passport) issued today. UM3867 said yes. Conversation continued about going to get MANCIA's and MANCIA's wife's passport.

MANCIA said he (MANCIA) would come by with that (colors). UM3867 said okay. EOC

59.     In a call from May 24, 2022 (No. 528), MANCIA was caught asking a caller what MANCIA should "take him." The caller said "1 'yellow'"—one unit of yellow-colored fentanyl—and "half of 'window.'" Half of window likely meant a half unit of methamphetamine.

60.     On May 25, 2022, in a call that took place at 10:00:24, a caller using 510-975-5517 asked MANCIA if ISMAEL, who the caller described as "brother-in-law," had called MANCIA. The caller said that he had called ISMAEL last night, and said that he (the caller) had someone who was going to need "13 of 'perringo'" —in other words, likely 13 units of cocaine (I know that drug dealers have used the termed "perico," which sounds similar to "perringo," as code for cocaine). The call follows:

UM5517 to MANCIA

UM5517 asked what happened with MANCIA's brother-in-law. MANCIA asked what happened. UM5517 asked if Ismael, the brother-in-law, had called him (MANCIA). MANCIA said no. UM5517 said he (MANCIA) called him (Ismael) last night [U/I]. MANCIA said he (UM5517) had a contact down there who was going to be sending someone (third party), so he (UM5517) was going to need 13 of "perringo" [PH]. MANCIA asked for what time. UM5517 said he (UM5517) called the brother-in-law (Ismael) last night and told him (Ismael) by 11:00, but 11:30 worked because the guy (third party) said he (third party) was on his way and it was going to take him (third party) about an hour and a half to arrive. MANCIA said okay, and that he (MANCIA) would have it (13 "perringo"/possibly narcotics) on hand and to just [U/I]. UM5517 said alright, and would let MANCIA know once he (third party) was 10 minutes away to give him (MANCIA) an address to... [thought not finished by UM5517]. UM5517 asked if MANCIA remembered where he (MANCIA) took [U/I] by the house. MANCIA said alright.

UM5517 said he (UM5517) spoked with the brother-in-law (Ismael) and he (UM5517) was going to [U/I]. UM5517 said he (UM5517) would give it (money) to him (MANCIA) on behalf of the guy (third party), and would let him (MANCIA) know where the meet for the money. MANCIA said alright.

61.     Additionally, on May 27, 2022 (No. 568), as captured by the wiretap, MANCIA took in requests for various amounts and colors of fentanyl ("10 of 'yellow,' 5 of 'rainbow,' and 2 of 'purple'"). In the same call, the person with whom MANCIA was speaking clarified his requests for various amounts and colors of fentanyl (12 yellow, 5 of rainbow, 2 of purple, 2 of green). The call follows:

UM7025 to MANCIA

Parties greeted. UM7025 asked if MANCIA was going to bring that (possibly narcotics) to him (UM7025). MANCIA said yes and asked what he (MANCIA) should bring UM7025. UM7025 asked MANCIA to bring 10 of "yellow", 5 of "rainbow", 2 of "purple" and ... [thought not finished by UM7025] MANCIA said 1 more was missing (to complete) the 1/2. UM7025 told MANCIA to bring him (UM7025) the whole one, and to add the other 2. MANCIA asked what he (MANCIA) should take to UM7025 then. UM7025 said 12 of "yellow", 5 of "rainbow", 2 of "purple" and 2 of "green". UM7025 asked if that was (equaled) 18, MANCIA said 19. UM7025 told MANCIA to bring only 1 "green" then. MANCIA said okay. UM7025 said 2 of the "purple", 5 "rainbow" and ... [thought not finished by UM7025] MANCIA said okay, he (MANCIA) would give UM7025 a call once he (MANCIA) was close by. UM7025 said and the 12 of the "yellow". Parties said goodbye. EOC

22

## C.   EVIDENCE ESTABLISHES THAT DAVID WORKS WITH MANCIA TO DISTRIBUTE NARCOTICS

62.   Agents have established through surveillance and intercepted telephone calls that DAVID is a close associate of MANCIA'S who participates in MANCIA'S drug trafficking conspiracy.

63.   On May 12, 2022, for example, MANCIA called ABRAHAM (also known as Mosquiro), who used telephone number (510) 561-9789, at approximately 8:58 p.m. (TT3, No. 72).  A summary of their conversation is as follows:

> MANCIA asked ABRAHAM if the guy (third party) liked the "blue" (possibly narcotics). ABRAHAM said it (blue, possibly narcotics) was fire and asked MANCIA if he (MANCIA) had not seen the video (reference to call # 71). MANCIA asked ABRAHAM why that "animal" (possibly narcotics) was so... [thought was not finished by MANCIA] ABRAHAM asked for clarification. MANCIA said he (MANCIA) bet the "animal" (possibly narcotics) that was like [U/I] would burn more black than that one (possibly blue one). ABRAHAM said that these (possibly narcotics) were "horses" [U/I].
>
> MANCIA said he (MANCIA) had told David that that "animal" should be put in bags tomorrow, so that it could come out even, exactly [U/I]. ABRAHAM said they (ABRAHAM and MANCIA) should (put) it (possibly narcotics) in bags. MANCIA said yes, he (David) was going to make/put it (possibly narcotics) in bags. ABRAHAM said [U/I] once he (ABRAHAM) made it (possibly narcotics).

64.   I believe the foregoing involved a discussion of the distribution of narcotics, and showed that MANCIA and ABRAHAM are likely working together to distribute narcotics. I know from training and experience that drug dealers often use the term "fire" to describe narcotics that are high quality (as in, get the user high).  I also believe, based on my investigation, that the term "animal" is code for a particular type of narcotic.  I further believe the call involved narcotics based on MANCIA's statement that the animal would burn black; I know that drug users burn narcotics (e.g., through a pipe or the use of aluminum foil), allowing the user to inhale the active ingredient (e.g., fentanyl, black tar heroin) that gets the user high.  I further know from this investigation and

others that fentanyl comes in various colors, and that it can burn a particular color.  I believe that MANCIA and ABRAHAM are discussing the distribution of narcotics based on their discussion of packaging ("MANCIA said he (MANCIA) was thinking that the "animal" should be put in bags tomorrow, so that it would be even.  ABRAHAM said they (ABRAHAM and MANCIA) should (put) it (possibly narcotics) in bags.").  Drugs are commonly sold to users in pre-packaged little bags.  I believe that during this conversation, MANCIA referred to directing DAVID, in particular, to process the "animal" into distribution quantities in bags, with ABRAHAM.

65.     On May 20, 2022, at approximately 2:15 p.m., agents intercepted a call from MANCIA to DAVID, the user of (341) 895-3248 (TT3, No. 456). The following is an excerpt of the conversation between DAVID and MANCIA:

> MANCIA:     Go by, by twenty-seven (27th) and bring two (2) of the clean ones
>
> DAVID:       Okay, then. Yeah, yeah.

66.     Approximately two minutes later, agents intercepted another call from MANCIA, to DAVID (TT3, No. 457).  The following is an excerpt of the conversation between DAVID and MANCIA:

> MANCIA:     Two clean ones and bring three, three yellow ones
>
> DAVID:       Uh-huh.  Sounds good.

67.     Based on my knowledge of the investigation and training and experience, I believe that in this call, MANCIA directed DAVID to travel to an address on "27th"—based on my knowledge, prior surveillance on May 18, 2022, and evidence in this investigation, I believe MANCIA's reference to "27th" was a reference to 1508 27th Avenue, Apartment 32, Oakland,

California, a residence associated with MANCIA[5]—and bring MANCIA two units of un-cut drugs from the 27th Avenue residence ("…..Go by, by twenty-seven (27th) and bring two (2) of the "clean" ones").  I know that drugs are often "cut"—in other words, mixed—with other cheaper substances (e.g., cocaine might be mixed with baby powder) in order to increase the supply of drugs that the dealer can sell.  In this instance, I believe MANCIA's reference of "the clean ones" referred to drugs that were pure in quality and had not yet been "cut" or mixed with other cheaper substances.  I also know that drug traffickers often use the term "yellow" to mean yellow-colored fentanyl and "clean" to mean pure drug product.

68.     On May 30, 2022, at approximately 7:24 p.m., MANCIA called DAVID, the user of telephone number (341) 895-3248 (TT3, No. 632).  The following is a summary of the conversation:

> *MANCIA said Mitchell [PH] was going to give him (DAVID) 200 (possibly money) and asked that he (DAVID) hand him (Mitchel) a half. DAVID asked if of the yellow one, MANCIA said yes, the yellow one.*

69.     Based on my training and experience, conversation with more experienced agents, and my knowledge of this investigation, I believe that MANCIA was requesting that DAVID give half a unit ("a half") of yellow fentanyl ("of the yellow one, MANCIA said yes, the yellow one") to a customer named Mitchell, in return for $200 ("Mitchell [PH] was going to give him (DAVID) 200").  I believe, as I previously noted, that "yellow" refers to yellow-colored fentanyl.

---

[5] On July 27, 2022, agents executed a search warrant at 1508 27th Avenue, Apartment 32, Oakland, California and found narcotics as well as several individuals whom agents believe may be selling drugs for MANCIA and his associates in the drug trafficking conspiracy described above.  *See* 3:22-mj-70974 AGT, incorporated by reference herein.

70.     MANCIA called DAVID again approximately ten minutes later, at 7:34 p.m. (TT3, No. 633).  During the call, DAVID advised MANCIA that he was on his way to Mitchell's, the customer identified above:

> *MANCIA asked if DAVID had arrived. DAVID asked were. MANCIA said to Jose's. DAVID said he (DAVID) was leaving Bryan's and he had paid and he (DAVID) was on his way to Mitchell's.*

71.     On July 27, 2022, agents detained DAVID in connection with the execution of a state search warrant at 4220 Santa Rita Street in Oakland, California.  I spoke to DAVID in a Mirandized interview.  I played him a recording of intercepted calls (TT3, Nos. 456, 457, and 458) and he admitted that in these calls, MANCIA had directed him to bring two "yellows." As a result, I concluded that DAVID was the same individual identified by MANCIA as "DAVID," (TT3, No. 338), who utilized telephone number 341-895-3248, on calls intercepted in May and June 2022 over Target Telephone 3.[6]

72.     In sum, as evidenced by the foregoing, DAVID participated in a conspiracy with MANCIA and others to distribute drugs, including kilogram quantities of fentanyl, and used a telephone to further the drug trafficking conspiracy.  There is probable cause to believe DAVID has violated 21 U.S.C. § 843(b).

---

[6] In addition, David's telephone number, 341-895-3248, was subscribed to Angel David Rodriguez.

I declare under penalty of perjury that the above is true and correct to the best of my knowledge and belief.

/s/ Hakeem Oduniyi
by AGT
_____
HAKEEM ODUNIYI
Special Agent
Drug Enforcement Administration


Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1 and 4(d) on this 27th day of July 2022.  This application and warrant are to be filed under seal.

_____
HONORABLE ALEX G. TSE
United States Magistrate Judge

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☒ COMPLAINT  ☐ INFORMATION  ☐ INDICTMENT

☐ SUPERSEDING

**Name of District Court, and/or Judge/Magistrate Location**

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

### OFFENSE CHARGED

21 USC 843(b)-- Unlawful use of a communication facility

☐ Petty
☐ Minor
☐ Misde-meanor
☒ Felony

PENALTY: 4 years prison, $30,000 fine, 1 year supervised release, $100 special assessment

**DEFENDANT - U.S**

Angel David Rodriguez

DISTRICT COURT NUMBER

### PROCEEDING

Name of Complainant Agency, or Person (& Title, if any)

Drug Enforcement Administration

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40.  Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:  ☐ U.S. ATTORNEY  ☐ DEFENSE

} SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant

} MAGISTRATE CASE NO.

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

Name and Office of Person Furnishing Information on this form   STEPHANIE M. HINDS

☒ U.S. Attorney  ☐ Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned)   Alexandra Shepard

### DEFENDANT

**IS NOT IN CUSTODY**

1) ☒ Has not been arrested, pending outcome this proceeding. If not detained give date any prior summons was served on above charges

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)

**IS IN CUSTODY**

4) ☐ On this charge

5) ☐ On another conviction

6) ☐ Awaiting trial on other charges

} ☐ Federal  ☐ State

If answer to (6) is "Yes", show name of institution

Has detainer been filed?  ☐ Yes  ☐ No

} If "Yes" give date filed

**DATE OF ARREST**   Month/Day/Year

Or... if Arresting Agency & Warrant were not

**DATE TRANSFERRED TO U.S. CUSTODY**   Month/Day/Year

☐ This report amends AO 257 previously submitted

### ADDITIONAL INFORMATION OR COMMENTS

PROCESS:

☐ SUMMONS  ☐ NO PROCESS*  ☒ WARRANT   Bail Amount:

If Summons, complete following:
☐ Arraignment  ☐ Initial Appearance

Defendant Address:

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment*

Date/Time:   Before Judge:

Comments: